UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Bobbie Townsend,

      Plaintiff,

v.                         Case No. 12-10379

John Owens, *et al.*,           Sean F. Cox
                            United States District Court Judge

      Defendants.

_____/

## OPINION & ORDER

Plaintiff filed this § 1983 action against several police officers, following the execution of a search warrant at his home.  He asserts excessive force and deliberate indifference to serious medical need claims.  The matter is currently before the Court on: 1) a Motion for Summary Judgment filed by Defendant Officer Todd Pillsbury; and 2) a Motion for Summary Judgment filed by the remaining individual Defendants.  The parties have briefed the issues and the Court heard oral argument on October 24, 2013.

For the reasons set forth below, the Court shall GRANT IN PART AND DENY IN PART Defendant Pillsbury's Motion for Summary Judgment.  The Court shall grant the motion to the extent that it shall rule that he has qualified immunity as to Plaintiff's excessive force claim based upon the initial takedown and his deliberate indifference claim.  The Court shall deny the motion as to the excessive force claim based upon the force allegedly used during the handcuffing procedure, wherein Pillsbury allegedly pressed his knee into Plaintiff's neck, despite the fact that Plaintiff was wearing a cervical collar and did not resist in any manner, for five to

1

ten minutes.  The Court shall GRANT the remaining Defendants' Motion for Summary

Judgment because they are entitled to qualified immunity with respect to all claims asserted

against them.

## BACKGROUND

Plaintiff Bobbie Townsend ("Plaintiff" or "Townsend") filed this § 1983 action on

January 29, 2012.  His original Complaint asserted both § 1983 claims and a "gross negligence"

count.  In an Opinion & Order issued on August 13, 2012, this Court dismissed the gross

negligence count.  (Docket Entry No.  18).

Plaintiff's First Amended Complaint asserts §1983 claims against the following

Defendants: 1) John Owens ("Owens"); 2) Todd Pillsbury ("Pillsbury"); 3) Brian Warden

("Warden"); 4) Nelson Lakey ("Lakey"); 5) Doug McLeod ("McLeod"); 6) Dave Rampy

("Rampy"); and 7) Stacey Moore ("Moore").

Plaintiff has since dismissed his claims against Defendants Rampy and Moore (Docket

Entry No. 47).

Following the close of discovery, Defendant Pillsbury filed a Motion for Summary

Judgment on June 25, 2013.  (Docket Entry No. 50).  The remaining Defendants filed a joint

Motion for Summary Judgment on July 25, 2013.  (Docket Entry No. 55).

This Court's practice guidelines for motions for summary judgment provide, in pertinent

part, that:

> a.  The moving party's papers shall include a separate document entitled
> Statement of Material Facts Not in Dispute.  The statement shall list in separately
> numbered paragraphs concise statements of each undisputed material fact,
> supported by appropriate citations to the record. . .

2

b.  In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts.  The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record.  The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.

c.  All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

The parties complied with the Court's practice guidelines for motions for summary judgment such that: 1) along with Defendant Pillsbury's Motion for Summary Judgment, he included a "Statement of Undisputed Facts" ("Pillsbury's Stmt.") and 2) along with Plaintiff's Response to Pillsbury's motion, he filed his "Counter Statement of Disputed Facts" (Pl.'s Stmt A.").  In addition, along with the Burton Defendants' Motion for Summary Judgment, they filed a "Statement of Undisputed Facts" ("Burton Stmt.," Docket Entry No. 55 at Pg ID 10) and along with Plaintiff's Response to that motion, he filed his "Counter Statement of Disputed Facts" (Pl.'s Stmt B"; Docket Entry No. 60 at Pg ID 8).

The following material facts are gleaned from the parties' statements and the evidence submitted by the parties, *taken in the light most favorable to Plaintiff.*

Plaintiff has a criminal history, including armed robbery and attempted murder. robbery, attempted murder.

On November 16, 2008, Plaintiff was involved in a motor vehicle accident that is unrelated to this case.  (Burton Stmt. at ¶ 2; Pl.'s Stmt. B at ¶ 2).

Plaintiff later filed a lawsuit against Farm Bureau General Insurance and GMAC Insurance regarding that accident.  (*See* Ex. C to Burton Defs.' Br.).  In that action, Plaintiff

3

alleged that as a result of the collision that occurred on November 16, 2008, he "sustained severe debilitating injuries including but not limited to injuries to his cervical and lumber spine."  (*Id*. at 2).

On January 28, 2009, a state court judge authorized a search warrant regarding Plaintiff's residence on Kenneth Street in Burton, Michigan, in reliance upon an affidavit and application by Officer Owens. (Burton Stmt. at ¶ 4; Pl.'s Stmt. B at ¶ 4; Ex. E to Burton Defs.'s Br.).  Plaintiff's Complaint in this action does not allege any deficiency or impropriety in the issuance of the search warrant.  (*Id*.).  The search warrant was based upon information obtained from a Burton police officer that drugs were being sold from the residence, surveillance of Plaintiff's residence, and a trash pull that showed positive evidence for marijuana.  (*Id*.).

The home on Kenneth Street is a single family residence with two bedrooms.  (Pl.'s Dep. at 37).

On January 28, 2009, Owens, who works for the Burton Police Department, was working for the Flint Area Narcotics Group (FANG), along with Officer Pillsbury from the City of Flint, and Michigan State Troopers Rampy and Moore.   (Burton Stmt. at ¶ 5; Pl.'s Stmt. B at ¶ 5).

Prior to executing the search warrant, the officers had a "raid briefing," during which they discussed the investigation, the suspects, and whether the suspects were known to carry weapons. (Pillsbury Dep. at 40).  The officers were aware of Plaintiff's criminal history, and the nature of his prior convictions.  (Owens Dep. at 91-92).

Prior to entering Plaintiff's home, the officers noticed that the home had video security cameras on its exterior.  Plaintiff acknowledges that the home, which Plaintiff states is

approximately 500 square feet,[1] was protected by three different video security cameras.

At approximately 9:00 p.m., the FANG team members made entry into Plaintiff's home, pursuant to the search warrant, after announcing, "police open up." (Burton Stmt. at ¶ 7; Pl.'s Stmt. B at ¶ 7; Pl.'s Resp. to Interrog. No. 7, attached as Ex. F to Def. Pillsbury's Motion).

At the time of the execution of the search warrant, Plaintiff was home and so was his then-girlfriend Jessica Baker ("Baker").[2]  Plaintiff did not open the door.  Plaintiff testified that officers kicked the front door in after knocking several times.  (Pl.'s Dep. at 40-44)

Plaintiff was only one foot away from the door when entry was made by the officers. (Burton Stmt. at ¶ 10; Pl.'s Stmt. B at ¶ 10).  Plaintiff was wearing shorts, a t-shirt, and a neck brace.  (Pl.'s Dep. at 46).  The neck brace had been prescribed for Plaintiff as a result of the motor vehicle accident.  (*Id*.).  Plaintiff testified that the neck brace was a blue, soft-collar, cervical collar.  (*Id*. at 100-101).  He testified that he was wearing a "wife beater" t-shirt (i.e., a sleeveless white t-shirt) and that the collar was therefore visible.  (*Id*.).

Plaintiff testified that after the door opened, a "big white guy come in and grabbed me." (Pl.'s Dep. at 48).  This man was wearing street clothes, not a uniform, and was not wearing a badge.  Plaintiff describes this man as "about six one, six two, burly."  (*Id*. at 49).  He described the man as about two or three times the size of Owens, who was present for Plaintiff's deposition.  Plaintiff testified that he does not know if Owens was there but that it was not Owens who used excessive force.  (*Id*. at 49-50).  Plaintiff testified it was Officer Pillsbury who picked him up and threw him.  (*Id*. at 58-59).  Plaintiff testified as follows regarding the

---

[1]  *See* Docket Entry No. 60 at 8).

[2]Baker has since died of a heroin overdose.  (Pl.'s Dep. at 38).

5

description of the officer he believes was Pillsbury:

> Q.    Can you describe this six-foot-one, six-foot-two burly gentlemen in street clothes? Did he have facial hair, glasses?
>
> A.    He had facial hair.
>
> Q.    Are we talking a mustache, a beard?
>
> A.    I would say beard.
>
> Q.    Did he have a mustache?
>
> A.    I think.  I think it was like, you know, kind of like, you know, that kind of stuff, however they wear it like.  But it was a mustache, whatever you call it.
>
> Q.    And what color was the facial hair?
>
> A.    I want to say it was a dark color.  I don't remember.  Dark, dark.
>
> Q.    How about an age? Do you have an approximate age for this person?
>
> A.    I would say he would probably have to be, just guessing, probably in his 50's, late 40's, early 50's.
>
> . . . .
>
> Q.    And how about his hair? Did he have short hair, long hair?
>
> A.    I would say kind of short.  It wasn't long, like his shoulders or none of that like that.

(Pl.'s Dep. at 50-51).  The officer who entered said, "Police" as he entered the home.  (*Id.* at 52).

Plaintiff testified:

> Q.    Where did he grab you?
>
> A.    Really, to be honest, I don't – it happened so fast really, where he grabbed me I don't know.  All I know, I was grabbed, picked up and dropped on my head.  I don't know, because it happened just like that (Snaps fingers). I have no clue.  I was grabbed and then body slammed.
>
> . . . .
>
> Q.    And so, this police officer that you have described for us picked you up in some fashion, you don't know how he grabbed you, --
>
> A.    Yes, ma'am.
>
> Q.    – and somehow you landed on your head, and you don't know how that happened either?
>
> A.    Yeah, threw me on my head.  I know exactly what happened.
>
> Q.    What part of your body did he have ahold of so that he could throw you so that you could land on your head?
>
> A.    He grabbed me and flipped me upside-down.  How he did that, I don't

6

> even know.  Now, he grabbed me and flipped me up.
> Q.     And this happened immediately upon his entry?
> A.      Immediately.  He rushed me, just like I had a football or something.
> Q.      Were you running away from him?
> A.     No.  I didn't even have a chance to.  No. I didn't even have a chance.  It was just like that (snaps fingers), come straight in the door.

(Pl.'s Dep. at 51-53).  Thus, from the time of initial entry until the time Plaintiff was picked up and taken down by the plain clothes officer, it was a matter of seconds.  (*Id*. at 58).

Plaintiff testified that after he was on the ground, the next thing he can remember was the officer putting his knee on his neck.  (*Id*. at 59).  Plaintiff was wearing his cervical collar at this time.  He testified:

> Q.     And where were his hands?
> A.     I don't know where his hands was.  Somebody was putting handcuffs on me.  I don't know where his hands was.  My face was flat to the floor with his knee on there, so I have no clue where his hands was.
> Q.     How long did he have you on the ground with his knee on your neck?
> A.     If you ask me, I would say I was down there for about 10 minutes, if you ask me.  I don't know exactly how long I was down there.  Until they put the handcuffs on.

(*Id*. at 59-60).  Later in his deposition, Plaintiff testified that he was on the ground for five minutes:

> Q.     Now, you indicated that Officer Pillsbury had his leg on your neck –
> A.     Yes, sir.
> Q.     – for about 10 minutes, you said.
> . . . .
> A.     His knee.  I don't know, I don't know, five to 10 minutes, however long it took to put the handcuffs on and do whatever they did.
> Q.     What do you mean "do what they did"?
> A.     He threw me down, put his knee on my neck.  Somebody had my hands in the back of me, whoever it was I had no clue, and they put the handcuffs on.  From that point, then I was snatched up the young guy, and that's it.  However long it took to do that ordeal, five, 10 minutes, I don't know.

> Q.    So, you think it might've taken five minutes to take your arms and put handcuffs on them?
>
> A.    I mean, like I say, I was thrown on the ground, knee on my neck, hands put behind me, and they put the handcuffs and everything on just like that.
>
> Q.    So, as soon as they got the handcuffs on you, some other officer grabbed the cuffs?
>
> A.    Snatched me up, pulled me up.
>
>              How much time was into that, I don't know.  I'll say five minutes. I don't know.
>
> Q.    But that's your estimate?
>
> A.    Yes, sir.  I'll go with five minutes.

(*Id.* at 83-84).

Plaintiff testified that the only time he complained to the officers was when he asked, after the handcuffs had been applied, that they be placed in the front of him:

> Q.    Did you complain to the officers of injury to your neck at the time that they were there?
>
> A.    Well, I asked the Burton police, I said, "Hey, man."  I said, "My neck hurts, man.  Can you put the handcuffs in front of me?"  And he said, "No, nigger," So, that's the only complaint that I asked.

(Pl.'s Dep. at 102).

The perimeter around Plaintiff's home was secured by Warden, Lakey, and McLeod during the initial entry into the home.  (Burton Stmt. at ¶ 8; Pl.'s Stmt. B at ¶ 8).  Lakey testified that he was not physically present during the initial entry but that he entered the home within a matter of minutes following the initial entry.  (Lakey Dep. at 25).  McLeod testified that he was initially on the perimeter of the house but later entered the home and assisted in the search of the premises, searching a bedroom.  (McLeod Dep. at 11 & 18).

During the litigation involving the motor vehicle accident, Plaintiff was deposed. Plaintiff's sworn deposition testimony, given on November 25, 2009, includes the following:

8

Q.      After November 16th of 2008, the day of the accident, have you been
        involved in any subsequent personal injury incidents, slip and falls, dog
        bites, assaults, fall, anything like that?

A.      No.

. . . .

Q.      Since the accident November 16th, 2008 you have not been involved in
        any type of fights or altercation?

A.      No.  Other than the police, yeah, the police, yeah.

Q.      When did the –

A.      That's one of the reasons I had to move off Morrison.  They raided the
        house on Morrison.  That was one of the reasons of moving off Morrison.

Q.      Was it the Burton Police, State Police?

A.      Yeah. Burton.

. . . .

Q.      What were they looking for?

A.      They say marijuana.

Q.      Did they find any?

A.      No.

Q.      Okay.  Were you arrested?

A.      No.

Q.      Were there any fights, scuffles, anything like that with the police?

A.      No more than the handcuffs on.  Put the handcuffs, no more than the
        handcuff on.

Q.      They handcuffed you?

A,      Yeah.

Q.      Were you taken to the jail?

A.      No.

Q.      No?

A.      It ain't my house.

Q.      They took the handcuffs off?

A.      After they finished searching.

**Q.      Okay.  So, you were not injured at all during the police raid?**

**A.      No.**

**Q.      That's true?**

**A.      True.**

. . . .

**Q.      No other type of injuries, whatsoever, after the November, 2008
        accident?**

**A.      No injuries.  No.  I went to the hospital after the police left the next
        day.**

Q.      Okay.

A.      Yeah.

Q.      After that – February of '09 was the raid, so March 1st of '09 you went to the hospital?

A.      When was the raid?  The next day I went to the hospital.

Q.      That would be March 1st, 2009 because the information you gave to your attorney was the raid took place on February 28th of 2009.

A.      The next day I went to the hospital.

Q.      What hospital did you go to?

A.      Hurley's

Q.      Why did you go to Hurley?

 **A.      Because my neck and shoulder was hurting.**

Q.      What did they do for you at Hurley?

A.      Gave me some Vicodin.

**Q.      Okay.  Any other type of treatment you received?**

**A.      No.**

(Pl.'s Dep. at 44 - 50) (emphasis added).

Plaintiff ultimately settled the lawsuit involving the motor vehicle accident for

$125,000.00.  (*See* Ex. C to Burton Defs.' Br.).

### ANALYSIS

## I.      The Burton Defendants' Motion For Summary Judgment

Defendants Owens, Warden, Lakey, and McLeod ("the Burton Defendants") filed a joint

Motion for Summary Judgment.

As noted in Plaintiff's Brief, the allegations "against the Burton Officers are stated in

pertinent part:

> 12.    Defendant officers Rampy, Moore, **Owens, Warden, Lakey and McLeod** all participated with defendant Pillsbury in the use of excessive force and **failed to take reasonable measures to either intervene or prevent defendant Pillsbury from engaging further in the unlawful use of force.**
>
> 13.    *By failing to offer or summon medical attention* despite both objective and subjective knowledge of plaintiff's cervical injury each of the defendant

10

officers were deliberately indifferent to plaintiff's serious medical need which constitutes a violation of rights under the Fourteenth Amendment of United States Constitution.

16.     That **John Owens, Brian Warden, Nelson Lakey, Doug McLeod**, Dave Rampy and Stacey Moore failed to intervene, restrain and or protect plaintiff from the excessive force directed against plaintiff by defendant Todd Pillsbury's tackling and kneeing plaintiff in the neck while wearing a cervical collar.  (First Amended Complaint Dock. 24).

(Pl.'s Br. at 5) (bolding in original; italics added for emphasis).  Plaintiff concedes that the Burton Defendants did not use any force upon him but asserts that they failed to intervene when Pillsbury used excessive force on Plaintiff.

Accordingly, Plaintiff asserts two distinct claims against the Burton Defendants: 1) a § 1983 excessive force claim based on a failure-to-intervene theory; and 2) a § 1983 deliberate indifference to serious medical needs claim, based on their failure to seek medical attention for Plaintiff.

The Burton Defendants contend that they are entitled to summary judgment on several grounds.

**A.     Are The Burton Defendants Entitled To Qualified Immunity With Respect To Plaintiff's Section 1983 Claims?**

To state a claim under § 1983, a plaintiff must set forth facts that, when construed favorably, establish: 1) the deprivation of a right secured by the Constitution or laws of the United States; 2) caused by a person acting under the color of state law.  *Dominguez v. Correctional Medical Services,* 555 F.3d 543, 549 (6th Cir. 2009).

Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

11

would have known. *Id.; Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008). Determining whether government officials are entitled to qualified immunity generally requires two inquiries: 1) whether, viewing the facts in the light most favorable to the plaintiff, the plaintiff has shown that a constitutional violation occurred; and 2) whether the right was clearly established at the time of the violation. *Dominguez*, 555 F.3d at 549.

"[A] qualified immunity defense can be raised at various stages of the litigation including at the pleading stage in a motion to dismiss, after discovery in a motion for summary judgment, or as an affirmative defense at trial." *English v. Duke*, 23 F.3d 1086, 1089 (6th Cir. 1994).

Here, the Burton Defendants have raised the issue in the instant Motion for Summary Judgment, filed after the close of discovery.

Plaintiff asserts two distinct claims against the Burton Defendants: 1) a § 1983 excessive force claim based on a failure-to-intervene theory; and 2) a § 1983 deliberate indifference to serious medical needs claim, based on their failure to seek medical attention for Plaintiff.

"Each defendant's liability must be assessed individually based on his [or her] own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). Generally, mere presence at the scene, without a showing of direct responsibility for the action, will not subject an officer to liability. *Id.*

> 1. **Viewing The Facts In The Light Most Favorable To Plaintiff, Can Plaintiff Establish A Constitutional Violation As To Any Of The Burton Defendants?**

The first step in the qualified immunity analysis is to consider whether, viewing the facts in the light most favorable to Plaintiff, could Plaintiff establish a Constitutional violation with respect to any of the four Burton Defendants (Owens, Warden, Lakey, and McLeod).

12

a.      **Excessive Force Claim Under Failure-To-Intervene Theory**

Plaintiff now concedes that none of the Burton Defendants used excessive force with him but asserts that they may be held liable for failing to intervene when Officer Pillsbury used excessive force with him.

In order to hold any of the Burton Defendants liable for Officer Pillsbury's alleged use of excessive force inflicted upon Plaintiff, he must prove that the officer: 1) actively participated in the use of excessive force; 2) supervised the officer who used excessive force; or 3) owed the victim a duty of protection against the use of force. *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Ontha v. Rutherford County, Tennessee*, 222 Fed. App'x. 498, 505 (6th Cir. 2007).

Here, Plaintiff has not presented any evidence to establish that any of the Burton Defendants either actively participated in the alleged use of force by Pillsbury or supervised Pillsbury. That leaves only the third potential option for a finding of liability – that the Burton Defendants owed Plaintiff a duty of protection against the use of force.

A "police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner,* 119 F.3d at 429. "In particular, there must be a basis for concluding" that: 1) the defendant perceived that the other officer was using excessive force; and 2) that he had the means and opportunity to stop it. *Ontha*, 222 Fed. App'x. at 506.

Here, there are two segments wherein Plaintiff alleges that Pillsbury used excessive force. Plaintiff alleges that Pillsbury: 1) picked him up and threw him to the ground within seconds of entering the home; and 2) after Plaintiff way laying face down on the ground, pressed his knee

13

into Plaintiff's neck for five to ten minutes while handcuffing Plaintiff inside the home.

With respect to the first segment, even if they were present for this alleged incident, the Burton Defendants could not be found liable for failing to intervene. As discussed in *Ontha*, the courts are unwilling to impose a duty to intervene when an incident unfolds "in a matter of seconds." *Ontha*, 222 Fed. App'x. at 506. Plaintiff's own testimony is that Officer Pillsbury immediately picked him up and took him down on the ground in a matter of seconds. Indeed, Plaintiff's Response Brief does not argue otherwise regarding this incident, which Plaintiff acknowledges occurred "very quickly, 'immediately,' 'just like that.'" (Pl.'s Br. at 8).

Rather, Plaintiff's Brief focuses on the second segment. In doing so, Plaintiff notes that the home at issue is small and that the Burton Defendants entered the home soon after it was secured.

The perimeter around Plaintiff's home was secured by Warden, Lakey, and McLeod during the initial entry into the home. (Burton Stmt. at ¶ 8; Pl.'s Stmt. B at ¶ 8). Lakey testified that he was not physically present during the initial entry but that he entered the home within a matter of minutes following the initial entry. (Lakey Dep. at 25). McLeod testified that he was initially on the perimeter of the house but later entered the home and assisted in the search of the premises, searching a bedroom. (McLeod Dep. at 11 & 18).

After directing the Court to the above testimony, Plaintiff suggests that because the home is small, the Burton Defendants must have seen Plaintiff laying prone on the floor with Officer Pillsbury's knee in his neck.

As was the case in *Turner,* however, Plaintiff has not come forward with any *evidence* to establish that Owens, Warden, Lakey, or McLeod actually observed or should have known of

14

Officer Pillsbury's alleged use of force.  Plaintiff relies on pure speculation.  Just because they entered the house at some point does not mean that the Burton Defendants were even in the same room as Plaintiff, much less that they observed the alleged excessive force.  Plaintiff's speculation is insufficient to survive summary judgment.

The Burton Defendants cannot be held liable for the alleged excessive use of force under a failure-to-intervene theory.

**b.     Deliberate Indifference To Serious Medical Needs Claim**

Plaintiff alleges that "[b]y failing to offer or summon medical attention despite both objective and subjective knowledge of plaintiff's cervical injury each of the defendant officers were deliberately indifferent to plaintiff's serious medical need which constitutes a violation of rights under the Fourteenth Amendment of United States Constitution."  (Pl.'s First Am. Compl. at ¶ 13).

In their Motion for Summary Judgment, the Burton Defendants assert that this claim fails because: 1) all of the Burton Defendants testified that Plaintiff was not wearing a cervical collar or that they did not see one or see Plaintiff; 2) there is no evidence that the Burton Defendants saw the alleged use of force by Pillsbury; 3) the only complaint Plaintiff made at the scene was to ask that he be handcuffed in front versus behind; and 4) Plaintiff never requested medical care. (Defs.' Br. at 11-12).  Defendants assert that even if Plaintiff could establish the "objective component of a serious medical need, he cannot meet the subjective component as there is no evidence that the Burton Defendants 'possessed a sufficiently culpable state of mind in denying medical care.'" (*Id*.).  In sum, Defendants assert that there is no authority that the mere existence of a neck brace without any complaints or requests for medical care constitutes a serious medical

need.  (Defs.' Reply Br. at 6).

In responding to the motion, Plaintiff asserts that a "jury could very well conclude that plaintiff's cervical collar would evince a substantial likelihood for serious injury if excessive force was directed to a person so attired."  (Pl.'s Br. at 10).  He further asserts that "a genuine issue of fact exist whether or not the Burton officers actually drew the conclusion that plaintiff had a serious medical need, based upon both the presence of the cervical collar and his statement that his neck was hurting."  (*Id*.).

Plaintiff cannot proceed with a deliberate indifference to serious medical needs claim against the Burton Defendants.

"While the Eighth Amendment does not apply to pre-trial detainees, the Due Process Clause of the Fourteenth Amendment does provide them with a right to adequate medical treatment that is analogous to prisoners' rights under the Eighth Amendment."  *Gray v. City of Detroit*, 399 F.3d 612, 615-16 (6th Cir. 2005).

Here, however, Plaintiff was neither a prisoner nor a pre-trial detainee.  While Plaintiff was briefly in custody, for about an hour while the officers executed the search warrant, *he was not arrested on the day of the incident.*  Thus, Plaintiff would have to pursue a deliberate indifference to medical needs claim based on a "state-created danger theory" – which is a slightly more difficult standard to meet.  Because neither party has addressed this, however, and because the Court concludes that Plaintiff cannot meet the standard that would apply even if he were a pre-trial detainee, the Court will analyze it as such.

Under the Fourteenth Amendment, a plaintiff claiming denial of adequate medical treatment "must establish that the defendants acted with 'deliberate indifference' to serious

16

medical needs." *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

Deliberate indifference includes an objective and a subjective component. As to the objective component, the alleged medical need must be "objectively, sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

To satisfy the subjective component, the plaintiff must establish that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, and that he did in fact draw the inference, and that he disregarded that risk. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).

Here, Plaintiff cannot establish either component. First, Plaintiff cannot establish that he had an objectively, sufficiently serious medical need. Again, while Plaintiff was briefly in custody, for about an hour while the officers executed the search warrant, he was not arrested and *was released* once the search was completed. Significantly, although Plaintiff was free to do so after being released after the one-hour search, *he did not seek any medical treatment on the same day he was released*. Rather, the next day, Plaintiff went to Hurley Hospital complaining that his neck and shoulder were hurting. Plaintiff testified that he was given vicodan and that he received no further treatment.[3] Thus, Plaintiff cannot meet the objective component.

Plaintiff cannot establish the second component either. Taking the evidence in the light

_____

[3]In response to Pillsbury's motion, Plaintiff submitted some medical records showing that he had surgery on February 4, 2009. (Ex. 3 to Pl.'s Resp. to Pillsbury's Motion). But that record states that Plaintiff has been "involved in a motor car accident and developed Brown-Sequard Syndrome." Plaintiff cannot show that he had a serious medical need *on the day of the incident* because when he went to the hospital the day after the incident all they did was give him vicodan.

most favorable to Plaintiff, the germane facts are: 1) Plaintiff was wearing a cervical collar; 2) Plaintiff complained that his neck hurt and asked that the handcuffs be moved to the front; and 3) Plaintiff did not request any medical treatment.  Moreover, there is no evidence to establish that any of the Burton Defendants saw Officer Pillsbury's alleged use of force.  Under these facts, Plaintiff cannot meet the subjective component as to the Burton Defendants.

### 2.    Was The Right "Clearly Established?"

Moreover, even if there were a constitutional violation under these facts, there was no violation of a clearly established right.  *See Danese v. Asman*, 875 F.2d 1239,1244 (6th Cir. 1989) ("It is one thing to ignore someone who has a serious injury and is asking for medical help; it is another to be required to screen prisoners to find out if they need help.  The right established in [our] cases simply would not give reasonable officers notice that their actions" were illegal.).

## II.    Defendant Pillsbury's Motion For Summary Judgment

Defendant Pillsbury asserts that there are four reasons to dismiss Plaintiff's § 1983 claims against him: 1) Plaintiff testified in a prior lawsuit that there was no excessive force and that testimony must be credited over Plaintiff's deposition testimony in this case; 2) Plaintiff's description of the officer who allegedly used excessive force does not match Pillsbury; 3) the alleged use of force was reasonable under the circumstances; and 4) Pillsbury is entitled to qualified immunity because there was no violation of a clearly established right.

### A.    Is Pillsbury Entitled To Qualified Immunity?

The first step in the qualified immunity analysis is to consider whether, viewing the facts in the light most favorable to Plaintiff, could Plaintiff establish a Constitutional violation as to Pillsbury.

18

### 1.      Deliberate Indifference Claim

Pillsbury's motion asserts that this claim "is plainly without merit as Plaintiff has admitted he never asked for medical care."  (Def. Pillsbury's Br. at 17).

The Court concludes that Pillsbury is entitled to qualified immunity as to this claim for largely the same reasons that the Burton Defendants are entitled to qualified immunity.  The only difference as to Pillsbury is that he was aware of the application of the alleged excessive force, because he is the one that applied it.  But the fact remains that Plaintiff never asked for medical help and that he did not seek medical treatment after he was released that day.  Rather, he waited until the next day to seek treatment and, even then, the only treatment he received was a vicodan prescription.

### 2.      Excessive Force Claim

"In step one of the qualified immunity analysis, the court determines whether th[e] evidence produced by plaintiff, taken in the light most favorable to plaintiff but viewed from the perspective of a reasonable officer on the scene, establishes a claim of excessive force in violation of the Constitution."  *Grawey, supra*.  In determining whether an excessive force constitutional violation occurred, the court "must look at the objective reasonableness of the defendant's conduct, 'which depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight."  *Id.* (quoting *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007)).  "Among the most important factors to consider in determining the objective reasonableness of the force used are: 1) the severity of the crime at issue; 2) whether the suspect posed an immediate threat to the safety of the police officer or others; and 3) whether the suspect actively resisted arrest or attempted to evade arrest by

19

flight." *Grawey, supra.*

A "segmented approach" is applied to excessive force claims in the Sixth Circuit, under which the Court "'carve[s] up' the events surrounding the challenged police action and evaluate the reasonableness of the force by looking only at the moments immediately preceding the officer's use of force." *Greathouse v. Couch*, 433 Fed. App'x. 370,372 (6th Cir. 2011) (citing *Claybrook v. Birchwell,* 274 F.3d 1098, 1103-04 (6th Cir. 2001)). This segmented approach applies to "even short encounters lasting very short periods of time." *Greathouse*, 433 Fed. App'x. at 372.

Here, there are two segments as to the alleged force used by Pillsbury. Plaintiff alleges that Pillsbury: 1) picked him up and threw him to the ground within seconds of entering the home; and 2) after Plaintiff way laying face down on the ground, pressed his knee into Plaintiff's neck for five to ten minutes while handcuffing Plaintiff inside the home.

### a.    Initial Takedown Upon Entering The Home

Pillsbury asserts that consideration of the above factors shows that no excessive force was used in the alleged initial takedown. He states that, in this case, "at the time of the execution of the warrant (1) the officers were aware of Plaintiff's prior criminal history, (2) they knew that he was suspected of being involved in the drug trade, (3) they noticed the security cameras on the house, (4) the officers knocked numerous times without getting a response, and (5) Plaintiff was standing directly in front of the door when the officers entered. When all of these factors are considered, it is apparent that an officer would have been justified in pushing Plaintiff to the ground and placing a knee on him so that the officers could quickly take control of the situation and secure the scene." (Def. Pillsbury's Br. at 13).

His brief then discusses each of these factors.  First, he asserts that given Plaintiff's attempted murder and armed robbery convictions, it was reasonable for the officers to believe they may be encountering a person who may engage in violence during the execution of the search warrant.  Second, noting that the crime at issue was suspected drug dealing, he notes that the Supreme Court has stated that "the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence" and that "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation."  *Michigan v. Summers*, 452 U.S. 692, 702-03 (1981).  Third, he notes that when the officers arrived they noticed multiple security cameras outside the 500 square foot residence.  Yet, despite the officers knocking and announcing that it was the police, no one opened the door.  He contends that "[a]n objective officer in that situation would reasonably conclude that a violent suspected drug dealer is probably either disposing of evidence or arming themselves."  (Def.'s Br. at 15) (citing *Cabbell v. Rousseau*, 130 Fed. App'x. 803, 806 (7th Cir. 2005) (noting presence of security cameras outside suspected drug house as a factor that prefigured a violent confrontation).  Finally, Pillsbury notes that it is undisputed that when the officer initially entered the house, Plaintiff was standing one foot away from the door.

He argues that "putting it all together, the officers knew that Plaintiff was a violent felon, he was suspected of being involved in the drug trade, he did not open the door despite having security cameras, and when the officers entered Plaintiff was standing literally right in their face."  He asserts that "when all relevant factors are considered," the force at issue was reasonable as a matter of law.

21

In response, Plaintiff's brief focuses on the use of force in kneeing his neck, rather than the initial takedown.  (*See, e.g.*, Pl.'s Br. at 3-4) (asserting that there was no immediate threat to safety "to justify the use of force including the placement of a knee on a person[']s previously injured neck, who offers no physical resistence to being handcuffed.").  Plaintiff argues that the severity of the alleged crime, selling marijuana is not inherently violent and notes that search yielded no evidence of drugs or firearms to justify the use of force.  But the Court does not view the officer's actions in hindsight – the Court looks to what a reasonable officer would have done in these rapidly-unfolding circumstances.

Plaintiff also argues that he never resisted at any time.  The initial takedown, however, happened very quickly, before there would have been time for the officers to determine if Plaintiff would cooperate or resist.

Plaintiff also argues that an obvious indication of a pre-existing injury (i.e., the wearing of a cervical collar) should weigh into the analysis.  While the Court agrees it weighs into the analysis of the second segment, it does not weigh into the near-immediate initial takedown where a reasonable officer would not have time to evaluate the suspect's physical condition before acting.

In his Reply Brief, Pillsbury asserts that the "case law overwhelmingly indicates that the take down was justified.  *See e.g., Hayden v. Green*, 640 F.3d 150 (6th Cir. 2011) (reasonable to pull the plaintiff out of his car after he refused to follow orders); *Dunn v. Matatall*, 549 F.3d 348, 351-52, 354 (6th Cir. 2009) (reasonable to forcibly remove the plaintiff from his car, point a gun at him, and knock him to the ground resulting in a broken femur); *Totman*, 391 Fed. Appx. at 463-64 (officers did not violate plaintiff's rights by taking him to the ground)."  (Def. Pillsbury's

22

Br. at 20).

The Court agrees with Defendant Pillsbury that, under the facts presented here, he is entitled to qualified immunity because the force used in the initial takedown was reasonable as a matter of law.

### b.      Kneeing Plaintiff While On The Ground

Plaintiff testified that, following the initial takedown, he was kneed in the neck for approximately five to ten minutes before he was handcuffed.  He maintains he did not resist in any manner and that he was wearing a cervical collar at the time that the officer (allegedly Pillsbury) was forcefully pressing his knee into Plaintiff's neck.

Plaintiff contends that a "reasonable jury could conclude that the placing of a knee upon the neck of an arrestee wearing a neck collar, with hands in the air submitting to arrest and without resistance of any kind, is excessive force under the Constitution."  (Pl.'s Br. at 7).

The Court agrees with Plaintiff that Pillsbury is not entitled to qualified immunity as to this segment.  Although the officers deny seeing a cervical collar on Plaintiff, Plaintiff testified that he was wearing one and that it would have been visible given that he was wearing a "wife-beater" t-shirt, and the evidence must construed in a light most favorable to Plaintiff.  While the officer doing the near-immediate initial takedown would not have time to notice the collar, the same cannot be said of an officer who is on top of a man wearing a cervical collar and placing his knee into the neck where the collar is located for five to ten minutes.

The Court also concludes that there is ample case law establishing that the use of force against a suspect who has surrendered and not resisted in any manner is excessive.  Thus, the right is clearly established.  The Court therefore concludes that Officer Pillsbury is not entitled to

qualified immunity with respect to the excessive force claim based upon the kneeing incident.

**B.      Should The Court Dismiss Pillsbury Because Plaintiff's Description Of The Officer Who Used Excessive Force Does Not Match Pillsbury?**

Plaintiff has identified Pillsbury as the sole officer who allegedly used excessive force with him.

As an additional ground for dismissal of the excessive force claim against him, Pillsbury asserts that the Court should dismiss the claim because he does not match the physical description that Plaintiff gave of the officer who used excessive force on January 28, 2009. (*See* Pillsbury's Br. at 10-12).  Pillsbury notes that "Plaintiff testified that only one officer used the supposed excessive force," and Plaintiff described that officer in his deposition, as "being over 6 foot tall, in his late 40's to early 50's, with short hair, and a beard."  (*Id*. at 10). Pillsbury asserts that "at the time of the incident, Pillsbury was approximately 40, is 5 foot 11, did not have a beard" and had long hair.

In response, Plaintiff directs the Court to portions of his deposition transcript wherein he testified that he was able to identify the officer who used force as Pillsbury because he saw Pillsbury sign his name on an inventory sheet during the search.  (Pl.'s Br., citing Pl.'s Dep. at 80-81).  He contends this eyewitness identification of Pillsbury is sufficient.  Plaintiff also suggests that his description of the officer is not that far off.  In addition, he asserts that "[a]lthough any alleged discrepancy may make legitimate subject for cross-examination, it hardly constitutes a basis for summary judgment."  (Pl.'s Br. at 13).

The Court agrees with Plaintiff and shall deny this ground for relief.  The chart below shows the alleged discrepancies as to the physical description of the officer who used excessive

24

force:

| Plaintiff's Deposition Testimony: | Other Evidence: |
|---|---|
| "about six one, six two, burly."  (Pl.'s Dep. at 50-51). | Pillsbury testified that he is five feet eleven inches tall. (Pillsbury Dep. at 9). |
| He had facial hair:<br><br>A.        He had facial hair.<br>Q.        Are we talking a mustache, a beard?<br>A.        I would say beard.<br>Q.        Did he have a mustache?<br>A.        I think.  I think it was like, you know, kind of like, you know, that kind of stuff, however they wear it like.  But it was a mustache, whatever you call it.<br><br>(Pl.'s Dep. at 50-51). | Pillsbury testified that while he was working at FANG, during his undercover work, he "grew a mustache and goatee" but did not have facial hair on his cheeks. (Pillsbury Dep. at 39) |
| Plaintiff estimated the officer's age as late 40's or early 50's.  (Pl.'s Dep. at 50-51). | Pillsbury was 44 at the time of his deposition on May 15, 2013.  (Pillsbury Dep. at 9). |
| Plaintiff testified that the officer was white.  (*Id.*). | It is undisputed that Pillsbury is white. |
| Plaintiff testified the officer did not have long hair, it"wasn't long, like his shoulders or none of that like that."  (Pl.'s Dep. at 50-51). | Pillsbury testified that on the date in question his hair was long, as he was working under cover, and that he wore that long hair "either in a pony tail or my daughters braid it."  (Pillsbury Dep. at 37-38). |

The Court concludes that Defendant Pillsbury is not entitled to summary judgment as a result of the discrepancies between Plaintiff's description of the officer who allegedly used excessive force and other evidence concerning Pillsbury.

> **C.      Should The Court Disregard Plaintiff's Deposition Testimony In This Case That Conflicts With His Sworn Deposition Testimony In The Motor Vehicle Accident Case?**

Finally, Defendant Pillsbury contends that the Court should disregard certain portions of Plaintiff's deposition testimony in this matter because it directly contradicts his previously sworn deposition testimony in the motor vehicle accident litigation.  They direct the Court to cases

wherein the Sixth Circuit has applied the "sham affidavit rule."

In response, Plaintiff asserts that "the sham affidavit rule does not apply in the case at bar since plaintiff has not offered an affidavit in an effort to defeat summary judgment.  Defendant offers no legal basis to discredit testimony based upon prior testimony in separate and unrelated litigation between different parties."  (Pl.'s Br. at 8).  Directing the Court to *Quicksilver,* Plaintiff asserts that "at least one court has questioned whether the rule applies regarding statements arising out of different litigation."  (*Id*.) (citing *Quicksilver Resources, Inc. v. Eagle Drilling*, LLC, 2010 WL 4115397 (S.D. Tex. 2010)).  Plaintiff further asserts that his deposition testimony in this action should not be discredited because he can "resolve the disparity" between his deposition testimony in the litigation involving the motor vehicle accident and his testimony in this case.

### 1.    Should The Court Apply The Rule When The Testimony Is From Another Proceeding?

The district court in *Quicksilver* noted that the Fifth Circuit has not "squarely addressed whether the sham affidavit doctrine applies if the shown testimony is from a different proceeding," but it also noted that the parties had directed it to two Seventh Circuit cases that did so apply the doctrine.  *Quicksilver, supra*, at *1.  The district court then applied the doctrine and struck four paragraphs of the plaintiff's affidavit because they contradicted his prior sworn deposition testimony in another proceeding.

The Seventh Circuit applies the sham affidavit rule to situations where a party gave true contradictory testimony, under oath, in a prior unrelated proceeding.  *See, e.g., Essick v. Yellow Freight Sys., Inc.*, 965 F.2d 334 (7th Cir. 1992); *Bank of Illinois v. Allied Signal Safety Restraint*

*Sys.*, 75 F.3d 1162.

In *Bank of Illinois*, the court explained, "[w]e have long followed the rule that parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions." *Id.* at 1168. "The cases to which we have applied this rule, however, have all involved prior statements that were made under oath." *Id*. at 1169. "If the district court was correct in disregarding the [plaintiffs'] deposition testimony, therefore, it was because the testimony conflicted with their prior statements given under oath and not because it conflicted with statements they made to the various third parties." *Id*. The court also stated "[w]e are mindful that, in light of the jury's role in resolving questions of credibility, other circuits have cautioned that this rule ought to be applied with great caution." *Id*. The need for such caution is because a "definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go the weight of the evidence." On the one hand, "[t]o allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness [ ] was stating the truth." *Id*. On the other hand, however, when "a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, the party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Id.*

The Court shall cautiously apply that rule here.

### a.    Has Plaintiff Resolved The Disparity?

After concluding that the rule should be applied when the contradictory testimony was

27

given under oath in another proceeding, the Seventh Circuit considered whether a sufficient explanation existed.  It noted that a party has been allowed to present a statement that contradicts an earlier sworn statement in the following circumstances: 1) to clarify ambiguous or confusing testimony; 2) where the more recent statement is based on newly discovered evidence.  *Bank of Illinois, supra,* at 1171-72.; *see also Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908-09 (6th Cir. 2006).

In this case, Plaintiff contends that Office Pillsbury used excessive force in the initial takedown, wherein he picked Plaintiff up and threw him to the ground.  He also asserts that all of the officers showed deliberate indifference to a serious medical need when they failed to get medical attention for Plaintiff.  But Plaintiff testified as follows in the litigation involving the motor vehicle accident:

Q.   After November 16th of 2008, the day of the accident, have you been involved in any subsequent personal injury incidents, slip and falls, dog bites, assaults, fall, anything like that?

A.   No.

. . . .

Q.   Since the accident November 16th, 2008 you have not been involved in any type of fights or altercation?

A.   No.  Other than the police, yeah, the police, yeah.

Q.   When did the –

A.   That's one of the reasons I had to move off Morrison.  They raided the house on Morrison.  That was one of the reasons of moving off Morrison.

Q.   Was it the Burton Police, State Police?

A.   Yeah. Burton.

. . . .

Q.   What were they looking for?

A.   They say marijuana.

Q.   Did they find any?

A.   No.

Q.   Okay.  Were you arrested?

A.   No.

28

Q.      Were there any fights, scuffles, anything like that with the police?

A.      No more than the handcuffs on.  Put the handcuffs, no more than the handcuff on.

Q.      They handcuffed you?

A,      Yeah.

Q.      Were you taken to the jail?

A.      No.

Q.      No?

A.      It ain't my house.

Q.      They took the handcuffs off?

A.      After they finished searching.

**Q.      Okay.  So, you were not injured at all during the police raid?**

**A.      No.**

**Q.      That's true?**

**A.      True.**

. . . .

Q.      No other type of injuries, whatsoever, after the November, 2008 accident?

A.      No injuries.  No.  I went to the hospital after the police left the next day.

Q.      Okay.

A.      Yeah.

Q.      After that – February of '09 was the raid, so March 1st of '09 you went to the hospital?

A.      When was the raid?  The next day I went to the hospital.

Q.      That would be March 1st, 2009 because the information you gave to your attorney was the raid took place on February 28th of 2009.

A.      The next day I went to the hospital.

Q.      What hospital did you go to?

A.      Hurley's

Q.      Why did you go to Hurley?

 A.      Because my neck and shoulder was hurting.

Q.      What did they do for you at Hurley?

A.      Gave me some Vicodin.

**Q.      Okay.  Any other type of treatment you received?**

**A.      No.**

(Pl.'s Dep. at 44 - 50) (emphasis added).

There are three potential inconsistencies between the above testimony and Plaintiff's testimony/position in this case:

1)   An inconsistency between his prior testimony that the only fight or scuffle
involved his being handcuffed versus his testimony in this case that
Officer Pillsbury initially picked Plaintiff up and threw him to the ground;

2)   An inconsistency between his prior testimony that he was not injured
during the incident and his testimony here that he was injured during the
handcuffing, when Officer Pillsbury kneed Plaintiff's neck; and

3)   An inconsistency between his prior testimony that he did not seek any
medical treatment until the day after the incident, that even then he only
received vicodan, and that he had received no other type of treatment
versus his assertion here that he had a serious medical need and was
denied treatment, and his suggestion in this case that his injuries from the
incident required surgery.

The only inconsistency that Plaintiff addresses in his motion is the second one –

involving alleged injuries from handcuffing.

As to the other two, the Court concludes that Plaintiff has not offered any explanation for

the clear inconsistencies.  Thus, as to the first one, the Court may disregard Plaintiff's deposition

testimony regarding the initial takedown.  Doing so would provide an additional ground for

dismissing the excessive force claim based upon the initial takedown.  As to the third, there is no

actual deposition testimony or affidavit to disregard, but Plaintiff's prior testimony discredits

Plaintiff's suggestion that he received surgery following the incident due to the injuries he

allegedly received on the day of the incident.

As to the second inconsistency, the Court concludes that Plaintiff has offered a sufficient

explanation.  Although Plaintiff testified he was not injured from the incident, his testimony is

consistent with force having been applied during the handcuffing because he also testified that he

sought medical treatment the day after the incident.

**CONCLUSION & ORDER**

For the reasons set forth above, the Motion for Summary Judgment filed by the Burton Defendants (Defendants Owens, Warden, Lakey, and McLeod ) is GRANTED and all claims asserted against the Burton Defendants are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Defendant Pillsbury's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED to the extent that the Court RULES that Pillsbury is entitled to summary judgment with respect to Plaintiff's excessive force claim based upon the initial takedown and his deliberate indifference claim.  The Court DENIES the motion as to the excessive force claim based upon the force allegedly used during the handcuffing process.

IT IS SO ORDERED.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  October 29, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 29, 2013, by electronic and/or ordinary mail.

S/Jennifer McCoy
Case Manager

31